# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **RICKY BURKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:14cv1994 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Ricky Burks's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties pursuant to 28 U.S.C. § 636(c).

## Procedural History

Ricky Burks (Plaintiff) applied for DIB and SSI in September 2009, alleging that he became disabled on June 1, 2001, because of dyslexia, anxiety attacks, problems in his right leg, and arthritis in his lower back. (R.[1] at 270-76, 384.) His applications were denied initially and after a hearing held in January 2011 before Administrative Law Judge (ALJ)

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

Victor Horton.  (Id. at, 34-64, 92-93, 95-110, 119.)  The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ for further consideration of Plaintiff's residual functional capacity (RFC) and for the solicitation of supplemental evidence from a vocational expert (VE).  (Id. at 115-16.)  His applications were again denied after a supplemental hearing held in May 2012.[2]  (Id. at 19-29, 65-91.)  After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby adopting his decision as the final decision of the Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Robin Cook, Ph.D., testified at the first administrative hearing.

Plaintiff testified that he is married and has two children and six grandchildren.  (Id. at 38-39.)  He does not know the ages of his grandchildren.  (Id. at 39.)  He sometimes lives with one daughter and sometimes with another daughter or with a cousin.  (Id. at 40.)  He shares his food stamps – his sole source of income – for room and board.  (Id. at 41, 42.)  He is right-handed.  (Id. at 42.)  He is not on Medicaid.  (Id. at 43.)

Asked if the records were correct that he has an eighth grade education, Plaintiff replied that he did not know.  (Id. at 41.)  He does not remember leaving school.  (Id.)  He cannot do simple arithmetic and cannot read.  (Id. at 42.)

---

[2]Because neither Plaintiff nor his counsel received a copy of the ALJ's decision, the case was reopened and the same decision was entered again in November 2013 to protect Plaintiff's appeal rights.  (See id. at 11-18.)

Plaintiff uses a cane and wears a brace on his right ankle.  (Id. at 39.)  The cane is not prescribed, but his doctors told him he could use one if he wanted.  (Id.)  Asked about a reference in the medical records to him telling a doctor he did not have to use the cane all the time, Plaintiff testified he never said that and has been using the cane daily for the past five years.  (Id. at 54-55.)  The brace was prescribed, but he cannot remember by who.  (Id. at 40.)

He worked once as a school janitor, but got fired when his ride home did not pick him up and he fell asleep at the school.  (Id. at 44-45.)

Asked why he cannot work, Plaintiff explained that he has a bad back.  (Id. at 47.) His doctors have told him there is not much they can do for it other than prescribe him pain pills.  (Id. at 47-48.)  He broke his right leg in three places and later broke his right ankle. (Id. at 48.)  The ankle mended crooked.  (Id.)  He has anxiety attacks and feels like he cannot breathe and is going to pass out or die.  (Id. at 49.)  He takes medication for them, but it does not always help.  (Id.)  Also preventing him from working is his inability to read and write. (Id. at 50.)  Because of this, he cannot use public transportation by himself or fill out an application.  (Id.)  He has had a driver's license because the test was oral.  (Id.)

Plaintiff drinks a beer occasionally, but never hard liquor or wine.  (Id. at 51.)  He does not recall ever having a drinking problem.  (Id. at 52.)  He has never told a doctor he drinks daily.  (Id. at 53.)  He tried marijuana when he was a teenager, and was once arrested for possession of marijuana.  (Id. at 52, 53.)  He does not have a history of arrests.  (Id. at 53.)  Asked about the references in the records to him using marijuana, amphetamines, heroin, and cocaine, Plaintiff stated he has never used those drugs.  (Id. at 52.)

Asked about a reference in the report of a consultative examination to Plaintiff becoming belligerent, Plaintiff testified he was merely trying to explain about his leg and the doctor told him "to shut up." (<u>Id.</u> at 55.) It was the doctor who became belligerent. (<u>Id.</u>)

Plaintiff only prepares microwave meals because his back hurts if he stands over a stove. (<u>Id.</u> at 56.) He rinses his plate if he dirties one. (<u>Id.</u>) He does not do laundry or other household or yard chores. (<u>Id.</u> at 56-57.) He cannot stand for longer than five minutes, cannot walk for longer than five minutes, and cannot sit for longer than thirty minutes. (<u>Id.</u> at 57-58.) His right leg aches and is always swollen. (<u>Id.</u> at 58.)

Plaintiff had been on disability for a number of years beginning when he was nineteen. (<u>Id.</u> at 60.) This was because of his inability to read and write. (<u>Id.</u>) He does not know why he was taken off. (<u>Id.</u> at 61.)

Dr. Cook was then asked by the ALJ to assume an individual with Plaintiff's education, training, and work experience who can perform light work with additional limitations of never climbing ropes, ladders, and scaffolds and of only occasionally stooping, kneeling, crouching, crawling, and climbing stairs and ramps. (<u>Id.</u> at 61.) This individual can maintain concentration and attention for two hour segments during an eight-hour day; respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; adapt to routine, simple work changes and perform repetitive work according to set procedures, sequence, and pace. (<u>Id.</u> at 61-62.) Asked if this individual can perform any work, Dr. Cook replied that he can work as a garment sorter or sewing machine operator. (<u>Id.</u> at 62.) If this individual also can never kneel or crouch and

cannot read or write, he can still perform those two jobs. (Id. at 62-63.) If this individual occasionally has panic attacks without warning that require him to be off-task at least thirty minutes, he will not be able to perform the two jobs or any other. (Id. at 63.)

Plaintiff's past work was all below the level to be considered substantial gainful activity. (Id. at 61.)

Dr. Cook further stated that her testimony was consistent with the *Dictionary of Occupational Titles* except where explained. (Id. at 63.)

Plaintiff, Jeffrey F. Magrowski, Ph.D., Anne E. Winkler, M.D., Ph.D., and James D. Reid, Ph.D., testified at the supplemental hearing.

Plaintiff testified that his back and leg problems were a little worse since the previous hearing. (Id. at 70.) Sometimes, his depression and anxiety are worse. (Id. at 70-71.) Just as before, he only has an occasional beer – no more than two a year. (Id. at 71-72.) He does not use any illegal drugs and has not other than his use of marijuana when he was a teenager. (Id. at 72.) He has never had a drinking problem and has never gotten drunk. (Id. at 72-73)

Dr. Winkler, an internist and rheumatologist, testified without objection as a medical expert. Asked if her review of Plaintiff's medical records indicated any impairments demonstrated by medically acceptable diagnostic techniques, she identified a 2006 x-ray showing degenerative disc disease at one level of his lumbar spine; a 2007 right ankle fracture with ongoing deformity; and vocal cord leucodysplasia (a lesion) in 2009 that was not an ongoing problem. (Id. at 74.) None met or equaled a listing. (Id. at 75.) Based on the 2006 x-ray, she opined that Plaintiff would be limited to lifting or carrying twenty pounds

occasionally and frequently; to standing or walking for six hours in an eight-hour day; to never climbing ladders, ropes, or scaffolds and only occasionally climbing stairs; to occasional kneeling, crouching, crawling, bend, or stooping; to frequent balancing; and to avoiding unprotected heights. (Id. at 75-76.) He had no limits on sitting. (Id. at 75,) He had no manipulation, visual, or communicative limits. (Id. at 76.) He had only the one environmental limit. (Id.)

Dr. Reid, a licensed psychologist, also testified without objection as an expert witness. (Id. at 78.) He noted that Plaintiff had a full scale Intelligence Quotient (IQ) at age 14 of 70 and in 2006 of 69. (Id. at 79.) Plaintiff has been diagnosed with major depressive disorder and anxiety disorder, also described as panic disorder with agoraphobia. (Id.) The panic attacks were understandable if Plaintiff abused alcohol. (Id. at 79-80.) Dr. Reid was unable to say whether Plaintiff engaged in drug-seeking behavior, but found it significant that he specifically asked for benzodiazepine. (Id. at 81.) He also found it significant that Plaintiff's Global Assessment of Functioning (GAF) scores were never below 55 until he saw his recent psychiatrist in December 2011.[3] (Id. at 82.) Therefore, Plaintiff's panic disorder was moderate until then. (Id.) Plaintiff had seen the recent psychiatrist only once and had obtained refills of his prescriptions without being seen. (Id.)

---

[3]"According to the [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Dr. Reid further testified that Plaintiff met Listing 12.05 if his IQ score of 69 was valid and if he had another condition, e.g., anxiety disorder. (Id. at 82-83.) If Plaintiff was using drugs and alcohol in 2006, his IQ score might be slightly affected. (Id. at 83.)

Based on his review of the medical records, Dr. Reid testified that he would rate a hypothetical person described therein as being moderately impaired in daily living and social functioning and markedly impaired in concentration, persistence, and pace. (Id. at 84.) There had been no episodes of decompensation. (Id.)

Testifying as a VE, Dr. Magrowski was asked to assume a hypothetical person with Plaintiff's education, training, and work experience who had no exertional limitations but was limited to understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; who could maintain concentration and attention for two-hour segments over an eight-hour day; who could respond appropriately to supervisors in a task-oriented setting with only casual and infrequent contact with coworkers and others; who could adapt to routine simple work changes; and who could perform work at a normal pace without production quotas. (Id. at 87.) He testified that this individual could perform light cleaning work and the job of a mail clerk. (Id. at 88.)

If this hypothetical person was also limited to light work and could stand or walk six hours out of eight; could occasionally climb stairs and ramps; could frequently balance but only occasionally stoop, kneel, crouch, or crawl; and could not be exposed to hazards or heights, there would be no impact on the cited jobs. (Id. at 88-89.) If this hypothetical person also would not be able to maintain concentration and attention for two-hour segments

over an eight-hour day or perform work at a normal pace without some accommodation, there were no jobs he could perform.  (Id. at 89.)

As had Dr. Cook in the earlier hearing, Dr. Magrowski stated that his testimony was consistent with the *Dictionary of Occupational Titles* except where explained.  (Id. at 90.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included documents generated pursuant to Plaintiff's application, school records, records from health care providers, and various assessments of her mental or physical capabilities.

On a Disability Report, Plaintiff disclosed that he is 6 feet tall and weighs 250 pounds. (Id. at 383.)  He stopped working in June 2001 because he could not read the names of the chemicals necessary to do his job.  (Id. at 384.)  He had completed the eighth grade and had been in special education classes.  (Id. at 388.)

The interviewer speaking with Plaintiff when he applied for DIB and SSI noted that he had problems reading, sitting, and standing.  (Id. at 381.)  He walked with a slight limp. (Id.)  "He smelled like he had been drinking."  (Id.)  His sister was with him and reported that she helped him with reading and took him everywhere because he cannot read the bus routes. (Id.)

Four pages of school records are included in the administrative record.  Two these are irrelevant.  (See id. at 424-25.)  One page indicates that Plaintiff was in an ungraded, special education classroom beginning in November 1967, when he was eight.  (Id. at 427.)  One indicates that he was given three IQ tests during his school years.  On one, given when he

was seven, he had an IQ of 72.  (Id. at 426.)  On one given when he was eleven he had the same IQ.  (Id.)  On another, given when he was fourteen, he had a 70.  (Id.)

The medical records before the ALJ are summarized below in chronological order beginning with those in 1994 when Plaintiff sought help for his anxiety and was diagnosed with a mild panic disorder with agoraphobia.  (Id. at 594-96, 625-27.)

In November 1998, Plaintiff saw Kimberly Ellis, M.D., with the Washington University Psychiatry Clinic (the Clinic) for his panic disorder with minimal agoraphobic difficulties.  (Id. at 597-601, 628-32.)  He had a GAF of 60.  (Id. at 599.)  Plaintiff reported that his panic attacks stabilized on Klonopin (the brand name for clonazepam, a benzodiazepine used to treat anxiety or panic disorder).  (Id.)  He denied any symptoms of depression.  (Id.)

In October 1999, Plaintiff was seen at the Clinic by Dan Haupt, M.D., for a re-screening visit.  (Id. at 602-04.)  He was diagnosed with panic disorder with agoraphobia, in remission, prescribed imipramine (an antidepressant) and clonazepam.  (Id. at 604.)  He was encouraged to stop drinking because his depression worsened when his alcohol intake increased.  (Id.)

Plaintiff saw Dr. Haupt again in January 2000, reporting that he was experiencing seven to eight panic attacks a month.  (Id. at 536, 605.)  Dr. Haupt noted that Plaintiff was using more clonazepam than prescribed and calling early for refills.  (Id.)  Plaintiff agreed to try gabapentin and was to return in two months.  (Id.)

Plaintiff returned in April, explaining that he had discontinued the gabapentin due to sexual side effects. (Id. at 537, 606.) He agreed to try mirtazapine, an antidepressant. (Id.) That and clonazepam were prescribed. (Id.) In May, Plaintiff reported that he was doing fairly well and having panic attacks twice a week. (Id. at 538, 607.) He was continued on his current medications. (Id.)

When seen in June, Plaintiff was noted by Dr. Haupt to have a history of benzodiazepine dependence and to have "frequently called [with] fantastic stories requesting early refill." (Id. at 542, 611.) One refill was authorized; no further were to be given. (Id.)

In July, Plaintiff was seen at the Clinic by Tabassum Saba, M.D., for a clinic intake assessment of his panic disorder. (Id. at 543-47, 612-16.) Plaintiff reported he had been sober for eighteen years and had not used illegal drugs for twenty. (Id. at 543.) He was having three panic attacks a week, which he reported were successfully treated with clonazepam. (Id. at 544.) And, he was doing well on his current dose of clonazepam. (Id.) His last job was six months earlier. (Id. at 545.) His only sources of income were disability[4] and food stamps. (Id.) His assets included being in good physical health. (Id. at 546.) He was continued on clonazepam with no refills. (Id.)

One month later, Dr. Saba authorized by telephone a one month refill of clonazepam. (Id. at 548, 617.)

---

[4]The record reflects that Plaintiff received Social Security disability benefits from November 1991 through March 2004. (Id. at 11.) His disability was found to have ended in July 2002, but he elected to continue receiving benefits while his administrative challenges to the cessation were pending. (Id.)

In December, Plaintiff telephoned for one refill of clonazepam; a one month supply was authorized. (Id. at 539, 608.)

In January 2001, Plaintiff was seen at the Barnes-Jewish Hospital (BJH) emergency room for his complaints of painful and discolored toes on his right foot. (Id. at 509-15, 743.) He was given ibuprofen, the two injured toes were tapped, and he was told to apply ice and elevate his foot for the next two days. (Id. at 514, 515.)

In February, Dr. Saba authorized by telephone a refill of clonazepam and contacted Plaintiff to inform him that he had to make an appointment because it had been so long since he had been seen. (Id. at 549, 618.) Plaintiff explained he could not come early because of his work schedule but would make an appointment as soon as possible. (Id.)

After an eight-month absence, Plaintiff was seen by Dr. Saba on March 7 for a follow-up visit. (Id. at 540, 610.) He reported that he had not come for follow-up visits because he had been working. (Id.) He was doing fine, but still having panic attacks two or three times a week. (Id.) The clonazepam "helped a lot." (Id.) His mental status examination was normal. (Id.) He was described as stable and continued on clonazepam. (Id.) He was to return in twelve weeks. (Id.)

In June, Plaintiff reported to Dr. Saba that his panic attacks had increased in frequency, consequently he then had to take a double dose of clonazepam. (Id. at 541, 610.) He was working part-time. (Id.) He could leave his house without difficulty and had a normal mental status examination. (Id.) Dr. Saba opined that Plaintiff may have developed a tolerance for clonazepam and doubled the dosage. (Id.)

In December, Plaintiff was seen at the Clinic by Jenna Hiestand, M.D. (Id. at 551-53, 619-21.) His clonazepam prescription was refilled; he was to return in three to four months. (Id. at 553.)

Plaintiff next saw Dr. Hiestand in May 2002. (Id. at 554.) He reported having more panic attacks and avoiding going out. (Id.) His dosage of Klonopin was increased, and he was to return in three months. (Id.)

Plaintiff did not return to the Clinic for eleven months. He was seen in April 2003 for a clinic intake assessment by Aline Gilbert-Johnson, M.D. (Id. at 527-30, 555-56, 622-24, 739-42.) He reported having two to three panic attacks a day. (Id. at 528.) His Klonopin prescription was renewed; one for Celexa (a selective serotonin reuptake inhibitor (SSRI) prescribed as an antidepressant) was added. (Id. at 529.) He was to return in four weeks. (Id.)

Plaintiff was seen again at the Clinic in October for his panic disorder with agoraphobia. (Id. at 524-26. 736-38.) He reported his panic attacks still occurred daily, but were reduced in number. (Id. at 525.) He was continued on Klonopin and was to return in two months. (Id. at 526.)

Plaintiff's next medical record is a notation made in July 2004 when he telephoned for a refill of clonazepam and was informed that one would not be given until he scheduled an appointment. (Id. at 523.)

In November, Plaintiff had a clinic intake assessment by Stephanie Purcell, M.D. (Id. at 517-22, 732-35.) Plaintiff, then forty-five years old, reported that he had begun to have

anxiety symptoms at approximately age twenty-five. (<u>Id.</u> at 517.) He further reported that the only medication that provided him any relief was clonazepam. (<u>Id.</u>) Dr. Purcell noted that his chart reflected that Plaintiff was "frequently noncompliant with scheduled appointments." (<u>Id.</u> at 517-18.) He had a pattern of presenting for a re-screening appointment and then one follow-up during the year, but missing several intervening appointments and requesting early refills of clonazepam. (<u>Id.</u> at 518.) He explained that he cannot work due to his anxiety and back pain. (<u>Id.</u>) He smoked one to two packs of cigarettes a day and drank one to two beers a day. (<u>Id.</u>) He was diagnosed with panic disorder with agoraphobia, currently in remission, prescribed clonazepam, and was to return in three months. (<u>Id.</u> at 519.)

Plaintiff was seen in January 2005 at BJH for a routine follow-up at the Internal Medicine Clinic. (<u>Id.</u> at 504-08, 646-51.) He smoked one to two packs of cigarettes a day and drank three to four cans of beer a day and one-half pint of whiskey three to four times a week. (<u>Id.</u> at 505.) He had intermittent chest pain at rest and back pain. (<u>Id.</u>) He had back pain with straight leg raises but no radiculopathy. (<u>Id.</u> at 506.) His strength was 5/5 throughout. (<u>Id.</u>) He complained of a "'gagging' sensation" and was given a trial of Ranitidine for possible gastroesophageal reflux disease (GERD). (<u>Id.</u> at 507.) He was told to decrease his alcohol intake to one drink a day because of his hypertension. (<u>Id.</u>) Smoking cessation was encouraged. (<u>Id.</u>) It was noted that he was not on an SSRI and was told to discuss such with a psychiatrist. (<u>Id.</u>)

That same day, he was seen by Dr. Purcell. (Id. at 516, 731.) This was his first follow-up visit since his assessment the year before. (Id.) It was noted that he had "made repeated calls to the clinic in the interim requesting the completion of disability paperwork presented during that visit." (Id.) He described anxiety symptoms that occurred daily and depression that primarily manifested itself in a lack of sexual interest in his girlfriend. (Id.) Dr. Purcell explained that she could not opine on his ability to perform in the workplace due to her limited experience with Plaintiff. (Id.) On examination, Plaintiff had a "'fine'" mood, euthymic affect with a fair range; fair insight and judgment; fluent and normal speech in rate, rhythm, and volume; and a logical and goal-directed flow of thought. (Id.) There was no evidence of deficits in memory or cognition. (Id.) She diagnosed him with a history of panic disorder with agoraphobia, currently in remission. (Id.) She noted that his treatment course was "complicated by self-titration of benzodiazepine dosage, requests for early refills, and noncompliance . . . ." (Id.) He was continued on his current medication, clonazepam, and was additionally prescribed Wellbutrin for his depression. (Id.) He was to return in six weeks. (Id.)

In July, Plaintiff had another intake assessment at the Clinic; this time by Fay Womer, M.D. (Id. at 468-70, 728-30.) Plaintiff complained of daily panic attacks that had begun nine years earlier; depression that began the same time; decreased energy; and occasional feelings of hopelessness and helplessness. (Id. at 468-69.) He drank a beer two to three times a week; smoked a pack of cigarettes a day; and had a history of marijuana, cocaine, and IV drug use in his teenage years. (Id. at 469.) Dr. Womer diagnosed panic disorder with

agoraphobia and history of cocaine/cannabis/IV drug abuse. (Id. at 468.) Plaintiff's GAF was 61 to 65.[5] (Id.) Dr. Womer noted that Plaintiff was "known to be poorly compliant with follow up." (Id.) Plaintiff was continued on Klonopin, which he described as the only medication which provided any relief from his symptoms. (Id. at 468, 470.) He was also to be provided supportive psychotherapy and psychoeducation. (Id. at 470.)

Plaintiff saw Dr. Womer again on October 28, reporting that he was experiencing panic attacks once or twice a day and had been for the past four to five weeks. (Id. at 464-66.) The attacks would resolve after he took Klonopin. (Id. at 465.) On examination, he was calm, cooperative, and pleasant. (Id.) He had normal and fluent speech; an "okay" mood; a euthymic affect; "grossly intact" memory and concentration; and fair insight and judgment. (Id.) He maintained good eye contact. (Id.) His diagnosis was panic disorder with agoraphobia and polysubstance abuse, in remission. (Id. at 466.) He was, at his request, to return in two months. (Id.) His prescription for Klonopin was renewed at the current dosage. (Id. at 464.) Dr. Womer noted three days later that Plaintiff was interested in part-time employment and having difficulty because of his reading and writing disabilities; he wanted to be referred to a service that could assist him. (Id. at 463.)

Plaintiff's next appointment with Dr. Womer was on December 28; he did not keep it. (Id. at 462.)

---

[5]A GAF between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning . . , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

Plaintiff saw Dr. Womer again in February 2006, complaining of continuing depression due to the loss of disability and of financial independence. (Id. at 460-61.) He was experiencing panic attacks once a day and had been for the past three to four weeks. (Id. at 460.) His energy, sleep, and appetite were all good. (Id.) On examination, he was as before. (Id.) He was tolerating the medication without any side effects. (Id.) Dr. Womer discussed with him taking an SSRI for optimal symptom control, but Plaintiff explained that he did not tolerate SSRIs well and that Klonopin adequately controlled his symptoms. (Id.)

It was not until April 2007 when Plaintiff returned to the Clinic and was seen by Elise M. Fallucco, M.D. (Id. at 454-59, 724-27.) Plaintiff reported a history of chronic anxiety attacks beginning in his mid-thirties when his sister died in a house fire. (Id. at 454.) He described the attacks as lasting between thirty and sixty minutes and as worsening over the past five to six weeks. (Id.) Klonopin helped to ease the attacks. (Id.) He used marijuana as a teenager but was never a heavy drinker. (Id. at 455.) On examination, he initially appeared "somewhat entitled and hostile and . . . also defensive." (Id.) His speech was slightly increased in amount, but normal in rate and volume. (Id.) His thought content lacked delusions, hallucinations and homicidal or suicidal ideation. (Id.) His flow of thought was goal-directed; his affect was slightly irritable; his mood was "'okay'"; his insight and judgment were fair. (Id. at 456.) He was alert and oriented to time, place, and person. (Id.) Based on his vocabulary, his intellect was below average. (Id.) Dr. Fallucco diagnosed Plaintiff with panic disorder with agoraphobia and with a GAF of 65 to 70. (Id.) She discussed with him the dangers of monotherapy with benzodiazepines and that clonazepam

was an addictive medication. (Id.) She recommended he taper off of Klonopin and gave him a corresponding prescription. (Id.) She also gave him samples of Lexapro, an antidepressant. (Id.)

On May 10, Plaintiff was taken by ambulance to the BJH emergency room with complaints of a painful right ankle after he fell down stairs. (Id. at 471-95, 561, 564-69, 641-45, 680-723.) It was noted that he had alcohol on his breath. (Id. at 476.) He explained he had had three beers and was not drunk. (Id.) X-rays of his right foot and ankle revealed a healed fracture of the distal right tibia and a new fracture of the right ankle. (Id. at 491-93, 566-69, 686-89.) His right foot was placed in a splint; and he was given crutches and told to be non-weight bearing on his right lower extremity. (Id. at 482, 492.) Awaiting discharge, Plaintiff became short of breath and began sweating. (Id. at 482.) He was placed back on a bed and examined. (Id. at 483.) Chest x-rays revealed small lung volumes with vascular crowding. (Id. at 493, 684.) A computed tomography (CT) scan of his chest showed no pulmonary embolism. (Id. at 493-94, 564-65.) Plaintiff improved on ketorolac (a nonsteroidal anti-inflammatory drug) and was discharged. (Id. at 478, 495.)

When seen at BJH on May 23, Plaintiff declined to proceed with fixation of the ankle, as recommended. (Id. at 502-03, 563, 676-79, 770.) Although he would then be at greater risk of developing arthritis and ankle pain, Plaintiff explained that he already had arthritis and was "a low-impact, low-activity person" who spent most of his day watching television. (Id. at 502.) On examination, his right lower extremity was markedly swollen and tender

with a gentle range of motion.  (Id.)  He was placed in a splint and was to return in two weeks for a cast.  (Id.)

Plaintiff returned on June 6.  His right lower extremity was "extremely swollen and tender."  (Id. at 500-01, 673-75.)  He continued to not be interested in an operative fixation. (Id. at 500.)  His right leg was placed in a short cast.  (Id.)  He was to remain nonweightbearing, and was to return in four weeks.  (Id.)

When the cast was removed on June 2, swelling was still present in Plaintiff's right leg. (Id. at 498-99, 669-72, 769.)  X-rays of the right ankle showed a healing distal tibia and fibula fractures with bone ossification.  (Id. at 498.)  His right leg was placed in a boot and he was instructed to use crutches at all times.  (Id. at 499.)

Plaintiff telephoned the Clinic on August 6 for a refill of clonazepam.  (Id. at 768.)

Two days later, he was seen at BJH and reported he had been doing well and had no pain or weakness in his right lower extremity.  (Id. at 496-97, 562, 666-68, 767.)  He had begun to advance his weightbearing on his own initiative.  (Id. at 496.)  He had some mild swelling of his right ankle but no tenderness to palpation or range of motion.  (Id.)  He was instructed on weaning off use of the crutches and on gradually increasing the amount of time spent weightbearing.  (Id.)  He was reminded about the importance of stopping smoking.  (Id. at 497.)

In September, Plaintiff telephoned the Clinic for a refill of clonazepam.  (Id. at 766.)

Plaintiff called again in October for a refill of clonazepam.  (Id. at 765.)  One was given as he had an appointment in November.  (Id. at 765.)

Plaintiff missed the November 5 appointment. (Id. at 764.)

Plaintiff called in December for a refill of clonazepam, but was told he would be given one to only last until his scheduled re-screen in January because he had not been in the clinic that year. (Id. at 763.)

On January 14, 2008, Plaintiff was seen at the Clinic by Elizabeth Woods, M.D. (Id. at 590-92.) He reported that his anxiety attacks improved with clonazepam. (Id. at 590.) He had been on disability for anxiety but it was stopped four years earlier due to his dyslexia. (Id.) Associated with the anxiety was depression. (Id.) On examination, he could recall three out of three at zero minutes and two out of three at three minutes; name Bush and Clinton as past presidents; and not do simple addition or spelling. (Id. at 591.) He was diagnosed with panic disorder with agoraphobia and a GAF of 55. (Id. at 592.) He was prescribed clonazepam and Effexor (an SSRI antidepressant) and was to return in one month. (Id.)

On February 18, a refill of clonazepam was authorized. (Id. at 589.) It was noted this refill should last until March 14. (Id. at 589.)

Plaintiff reported to Dr. Woods on February 29 that he had stopped taking Effexor after one day, restarted it a few days later, and stopped again after taking two doses over a five-day period. (Id. at 588.) He was having panic attacks every two weeks. (Id.) His mood was good; his concentration, energy, sleep, and appetite were all normal; his insight and judgment were fair. (Id.) Dr. Woods noted that Plaintiff's symptoms were "minimally

improved."  (Id.)  She discussed with him the importance of regular compliance.  (Id.)  He was to follow-up in four weeks.  (Id.)

Plaintiff missed his May 23 appointment.  (Id. at 587.)

Six days later, Plaintiff reported to Dr. Woods that he was continuing to have panic attacks three to four times a week and the Effexor made him too restless.  (Id. at 585-86.)  He attributed his minimal recreational activities to a lack of funds and not to panic attacks.  (Id. at 585.)  His mental status examination was within normal limits.  (Id.)  He was to start a trial of Celexa in addition to the clonazepam.  (Id.)

Plaintiff was seen at the Clinic in October by Daniel A. Yahya, M.D., for an annual rescreening evaluation.  (Id. at 449-53, 580-84.)  Plaintiff reported that his anxiety symptoms began in his mid-twenties.  (Id. at 449.)  Although a sibling had died in the months preceding the onset of the symptoms, he did not feel the two were related.  (Id.)  The symptoms lasted up to sixty minutes and would last all day if he did not take medication.  (Id.)  The only medication that relieved his symptoms was Klonopin.  (Id. at 450.)  He occasionally drank alcohol, but had not used drugs since using marijuana as a teenager.  (Id.)  He had not tried the Celexa prescribed him in May because he could only afford one medication – clonazepam.  (Id. at 450, 453.)  He was informed that a prescription costs four dollars a month.  (Id. at 453.)  Since his last visit, he had no difficulties with affective symptoms, his anxiety level was near baseline, and he was engaging in enjoyable activities.  (Id. at 450.)  He smoked up to two pack of cigarettes a day.  (Id. at 451.)  He had been in school until he was seventeen, but did not know at what grade he left.  (Id.)  He cannot work due to his

dyslexia.  (Id.)  On examination, he was fairly groomed, calm, and cooperative.  (Id.)  His gait and muscle tone were normal; his strength was 5 out of 5; his speech was normal in rate, rhythm, amount, and volume; his flow of thought was sequential and logical; his mood was "okay"; his affect was euthymic and stable; his insight and judgment were fair.  (Id. at 451-52.)  Dr. Yahya found his presentation to be most consistent with panic disorder with agoraphobia, and diagnosed him with such.  (Id. at 451.)  He did not have sufficient symptoms to meet the criteria for a depressive episode.  (Id.)  His GAF was found to be 55. (Id.)  Plaintiff was continued on clonazepam.  (Id.)  As Plaintiff preferred, he was to follow-up in two months but was encouraged to do sooner.  (Id. at 453.)

Plaintiff was seen at BJH in February 2009 for complaints of a hoarse and painful throat.  (Id. at 757-61, 913-18.)  He reported having difficulties with activities of daily living, including getting dressed, bathing, and walking.  (Id. at 758.)  He smoked two packs of cigarettes a day.  (Id. at 759.)  He was to try a proton pump inhibitor for six weeks, and, if there was no improvement, undergo a largyngoscopy and biopsy.  (Id. at 761.)

Two weeks later, he saw Dr. Yahya for psychotherapy and reported that "'[t]hings [were] okay.'"  (Id. at 755-56, 910-12.)  He had lost the prescription for Celexa, so did not get it filled.  (Id. at 755.)  He had been taking clonazepam one to three times a day for anxiety, and his mood was stable.  (Id.)  He was engaged in recreation activities.  (Id.)  He had a euthymic affect, fair insight and judgment, normal attention and concentration, and logical, sequential, and goal-directed thought processes.  (Id.)  He was diagnosed with panic disorder with agoraphobia and a GAF of 55.  (Id. at 756.)  His prescription for clonazepam

was renewed and he was again prescribed Celexa.  (Id.)  He was to follow-up in two months.  (Id.)

Plaintiff returned to BJH on March 17 for an evaluation of the hoarseness he had had for the past six months.  (Id. at 752-54, 906-09.)  He thought it had started when he was cutting grass.  (Id. at 752.)  He reported that the proton pump inhibitor had not helped.  (Id. at 752.)  It was noted that he had a strong history of tobacco and alcohol use.  (Id.) He was to have a laryngoscopy and biopsy.  (Id. at 753.)

Ten days later, he underwent a microlaryngoscopy and biopsy.  He was described as having "a significant history of tobacco and ethanol use with six-month history of sore throat and hoarseness."  (Id. at 531-35, 557-60, 570-73, 633-40, 658-64, 750-51, 841-74, 878-900.)  It was noted in a pre-operative assessment that he drank three beers daily.  (Id. at 557.)  A six-week treatment with a proton pump inhibitor had not provided any relief.  (Id. at 531.)  He was diagnosed with left true vocal cord leukoplakia.  (Id.)

When seen on April 2 for a follow-up, Plaintiff complained of a sore throat and decreased taste.  (Id. at 746-49, 837-40.)  He was to continue with his protein pump inhibitor and encouraged to stop smoking.  (Id. at 748)

Plaintiff contacted the Clinic in August for a refill of clonazepam.  (Id. at 744.)  A thirty-day prescription for citalopram (the generic form of Celexa) was authorized – enough to last him until his October 1 appointment.  (Id.)

Plaintiff kept the October 1 appointment and was seen by Donald D. Bohnenkamp, M.D.  (Id. at 833-36.)  His chief complaint was of anxiety attacks.  (Id. at 834.)  The attacks

had begun in his mid to late 20s.  (Id.)  He drank one beer a week and smoked one pack of cigarettes a day.  (Id. at 835.)  He reported he had been on disability for fifteen years, but it was recently stopped.  (Id.)  Dr. Bohnenkamp noted that the records reflected that Plaintiff had been on disability for more than twenty years. (Id.)  Plaintiff was continued on Klonopin, started on Zoloft (an SSRI antidepressant), and encouraged to stop smoking.  (Id. at 836.)  He was to return in one month.  (Id.)

Plaintiff returned in three months, in January 2010, reporting to Dr. Bohnenkamp that he could not afford the sertraline (the generic form of Zoloft) so never had it filled.  (Id. at 828-32.)  His sleep and energy were decreased; his appetite and concentration were normal.  (Id. at 831.)  He did not engage in recreational activities.  (Id.)  He was continued on Klonopin and again started on Zoloft.  (Id. at 832.)  His GAF was 55.  (Id.)  He was to return in two months.  (Id.)

 Plaintiff returned in May.  (Id. at 823-27.)  He was continuing to have problems, had stopped taking the Zoloft after two weeks, and was taking clonazepam.  (Id. at 826.)  He was having daily panic attacks.  (Id.)  His sleep and appetite were normal, and he engaged in recreational activities.  (Id.)  His affect was restricted; his mood was "'a little down'"; his insight and judgment were fair.  (Id.)  Dr. Bohnenkamp diagnosed Plaintiff with panic disorder with agoraphobia, continued him on his current regimen of Klonopin, and instructed him to restart the Zoloft.  (Id. at 827.)

In November, Plaintiff had an annual reintake evaluation at the Clinic by Vasileios Panagopoulos, M.D.  (Id. at 815-22.)  Plaintiff reported that he had experienced his first

panic attack at approximately thirty years of age.  (Id. at 819.)  He had since been having the unprovoked attacks intermittently.  (Id.)  They had been occurring daily, but were now happening with decreasing frequency.  (Id.)  Also, he had been depressed for at least the past fifteen years.  (Id.)  Currently, he was "somewhat down" but not extremely depressed.  (Id.)  His sleep and appetite were fine.  (Id.)  His energy was "somewhat low."  (Id.)  His only medication was clonazepam.  (Id. at 820.)  He was separated from his wife, but had had a girlfriend for the past ten years.  (Id.)  He was currently living with her.  (Id.)  He had been on disability, but it was recently discontinued.  (Id.)  He smoke a few cigarettes a day, drank three beers a month, and did not use drugs.  (Id.)  He had never had a problem with drugs or alcohol.  (Id.)  He has eight children and seven grandchildren.  (Id.)  On examination, he was calm, cooperative, well-groomed, and pleasant.  (Id.)  His speech was regular in rate and rhythm; his flow of thought was sequential, logical, and goal-directed; his affect was dysthymic but reactive, appropriate, and full-range; his insight and judgment were fair.  (Id.)  Plaintiff was interested in trying a new medication, so he was started on sertraline – at a cost of $4.70 per month – in addition to the clonazepam.  (Id. at 820, 821.)  He was diagnosed with panic disorder with agoraphobia, major depressive disorder, history of dyslexia, and possible history of attention deficit hyperactivity disorder.  (Id. at 818.)  His current GAF was 60 to 70.  (Id.)

Plaintiff next saw Dr. Panagopoulos in March 2011.  (Id. at 930-36.)  Plaintiff reported being in "a somewhat low mood as his girlfriend kicked him out" and he was staying with various friends or relatives.  (Id. at 934.)  He was having a panic attack once or twice

a day.  (Id.)  When one occurred, he would take clonazepam, which helped "a lot."  (Id.)  His mental status examination was generally normal with the exception that Plaintiff was alert and oriented to self and place but did not know the date, month, or year.  (Id.)  His diagnoses and GAF were unchanged.  (Id. at 935.)  He was continued on clonazepam and started on sertraline.  (Id.)

Plaintiff saw Dr. Panagopoulos again in May, explaining that he had not filled the sertraline prescription because he could not afford it, but was continuing to take the clonazepam as needed.  (Id. at 923.)  He reported having an occasional low mood and an occasional better mood.  (Id.)  He was having panic attacks two to three times a week; the clonazepam was "very effective."  (Id.)  His mental status examination was generally normal with the exception Plaintiff was alert and oriented to self and place but did not know the date, month, or year.  (Id.)  As before, his diagnoses and GAF were unchanged.  (Id. at 924.)  He was continued on clonazepam and encouraged to start the sertraline.  (Id.)  He was to return in July, at which time he would be seen by a new provider.  (Id. at 925.)

He did not return until December, at which time he had an intake assessment by Miriam L. Schroeder, M.D.  (Id. at 937-48.)  Plaintiff reported that clonazepam worked for him.  (Id. at 942.)  Providers kept "'trying to put [him] on antidepressants."  (Id.)  Dr. Schroeder noted that Plaintiff had missed several interim appointments with Dr. Panagopoulos.  (Id.)  Plaintiff reported having panic attacks at least four days a week, at least one of which would be significantly more severe than the others.  (Id.)  When experiencing an attack, Plaintiff will take clonazepam and then lie down.  (Id.)  The attacks lasted as long

as "'a couple hours,'" with the most severe portion lasting no longer than thirty minutes. (Id.) Plaintiff tended to avoid public and crowded places. (Id. at 942-43.) Plaintiff did not associate the attacks with any particular thoughts or worries. (Id. at 943.) Dr. Schroeder noted that Plaintiff also had a history of low moods which never entirely remitted. (Id.) She further noted that the various trials of other medications were not adequate as Plaintiff would develop side effects and unilaterally stop taking them. (Id. at 943-44.) Plaintiff reported that he was only certain that two of his alleged eight children were his. (Id. at 945.) He had not worked for the past twenty years. (Id.) He had been on disability for sixteen years for dyslexia, but it had been discontinued ten years ago. (Id.) He rarely drank and smoked at most a couple of cigarettes a day. (Id.) On examination, Plaintiff was adequately groomed and cooperative. (Id. at 946.) He had good eye contact; normal speech; a linear and concrete flow of thought; an "[o]kay mood" and euthymic affect; and fair insight and judgment. (Id.) He had no homicidal ideation, but did report occasional passive suicidal ideation. (Id.) He stated he would, however, never harm himself. (Id.) Dr. Schroeder opined that Plaintiff met the criteria for panic disorder characterized by agoraphobia and likely had major depressive disorder. (Id. at 946-47.) He had a GAF of 45.[6] (Id. at 941.) She continued him on clonazepam and started him on sertraline for his anxiety. (Id. at 947.) Although she wanted to see Plaintiff sooner, he explained that the earliest he could return was in two months because of transportation problems. (Id. at 948.)

---

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

In March 2012, Plaintiff telephoned Dr. Schroeder for a refill of clonazepam. (Id. at 949.) A call to the pharmacy revealed that he had been given a supply in February to last until his next appointment. (Id.) He had then rescheduled the appointment. (Id.) The call further revealed that Plaintiff had never picked up the sertraline, although it had twice been ready for him. (Id.) When reached by telephone, Plaintiff explained that he had lost a prescription for clonazepam and could not afford the sertraline. (Id. at 951.) Noting that he had never needed an increased dosage of clonazepam although he had been on it for many years, Dr. Schroeder authorized a refill. (Id.)

Later that month, Plaintiff missed his appointment with Dr. Schroeder. (Id. at 953.)

Dr. Schroeder authorized a refill of clonazepam again in April and told the pharmacy to get the sertraline ready for Plaintiff to pick up at the same time. (Id. at 952.)

Also before the ALJ were assessments of Plaintiff's physical and mental impairments and their resulting limitations.

In January 2006, pursuant to earlier DIB and SSI applications, Plaintiff was examined by L. Lynn Mades, Ph.D., a licensed psychologist. (Id. at 433-40.) Plaintiff complained of illiteracy, anxiety attacks, and back problems. (Id. at 433.) His anxiety attacks occurred four or five times a week, lasted approximately twenty times, and caused feelings of tightness in his chest, difficulty breathing, sweating, nervousness, and feeling like he was going to die. (Id. at 433-34.) The attacks had started nine years earlier. (Id.) He had received psychiatric treatment when he was a child due to behavior problems at school, e.g., anger and disrupting the class. (Id. at 434.) His next psychiatric treatment was ten years ago and was for anxiety.

(Id.)  His last use of alcohol was drinking two beers the previous Thanksgiving.  (Id.)  He last drank daily five to six years earlier and had never drunk hard liquor.  (Id.)  He had used marijuana as a teenager but not since, and had never used any other illegal drugs.  (Id.)  Given indications in his records of treatment for drug or alcohol problems and of a history of polysubstance abuse, Dr. Mades considered Plaintiff not to be a reliable informant about his substance use.  (Id.)  Plaintiff reported that he has eight children, is married but separated, and attended school until he was fifteen.  (Id. at 434-35.)  When in school, he was frequently suspended and was expelled seven or eight times.  (Id. at 435.)  On examination, he was casually dressed, well-groomed, generally cooperative, and pleasant.  (Id.)  He had normal hygiene, an alert expression, good eye contact, and normal posture and gait.  (Id.)  He wore sunglasses.  (Id.)  His speech was normal in rate, rhythm, and content.  (Id.)  His mood was euthymic; his affect was slightly restricted and generally appropriate; his thought content was normal; his memory was within normal limits; his insight and judgment were slightly limited.

 (Id. at 436.)  Plaintiff was given the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III).  (Id. at 436-37, 438.)  He had a verbal IQ of 71, a performance IQ of 73, and a full scale IQ of 69, placing him in the borderline to mildly mentally retarded range of cognitive functioning.  (Id. at 436, 439.)  Dr. Mades noted that when taking the test, Plaintiff "seemed to be making an effortful attempt to make his answers appear consistent with the concept of dyslexia.  He took a great deal of time, and made reversals that were both left-right and up-down. . . .  This type of performance is quite atypical for true dyslexia, and seemed more consistent with popular conceptions of what dyslexia might be."  (Id. at 436.)

Dr. Mades further noted that Plaintiff demonstrated an "ability to maintain adequate attention and concentration, with appropriate persistence and pace." (Id. at 437.) She diagnosed him with anxiety disorder, not otherwise specified, alcohol abuse, polysubstance dependence, in remission, and borderline intellectual functioning. (Id.) He had a GAF of 70. (Id.)

The same day, Plaintiff had a physical evaluation by Elbert Cason, M.D. (Id. at 773-79.) His chief physical complaints were of arthritis in his lower back, a fracture of his right lower leg and ankle, and a knot on the top of his left foot. (Id. at 773.) The arthritis he had had for eight to nine years. (Id.) He could walk half a block, stand for twenty minutes, sit for twenty-five, and go up five to six steps. (Id.) He could lift eight pounds. (Id.) He carried a cane in his right hand. (Id.) An x-ray taken in 2006 had shown osteopenia and spurring at L5, severe inner space narrowing at L5 and S1, and degenerative disc disease. (Id.) When he stood, his right foot was in an everted position and pointed outwards. (Id. at 773-74.) He walked with a limp. (Id. at 774.) He occasionally smoked a cigarette and drank one beer a week. (Id.) He was 5 feet 10 inches tall and weighed 256 pounds. (Id.) On examination, he had a decreased range of motion in his back, but no muscle spasms. (Id. at 775.) Straight leg raises were negative. (Id.) His right lower extremity was swollen. (Id.) If he held onto the examining table, he could heel and toe stand and partially squat. (Id.) He had a normal range of motion in his shoulders, knees, wrists, elbows, hips, and cervical spine. (Id. at 775, 778-79.) His grip strength was normal. (Id. at 775, 778.) The range of motion in his right ankle was diminished. (Id. at 779.) Dr. Cason opined that Plaintiff did not need to use an assistive device. (Id. at 775.) He diagnosed Plaintiff with degenerative disc disease

of the lumbar spine; history of fracture of the right lower leg and ankle with eversion of the right foot when walking; and an apparently benign knot on the dorsum top of his left foot. (<u>Id.</u> at 776.)

Three years later, in January 2009, Plaintiff underwent an evaluation by Dianna Moses-Nunley, Ph.D., a licensed psychologist. (<u>Id.</u> at 443-46.) Dr. Moses-Nunley described Plaintiff as "belligerent about having to participate in this examination based on the fact that his previous attempts to reinstate his benefits had been denied." (<u>Id.</u> at 443.) She also described him as a poor historian. (<u>Id.</u>) This and indications that he was misrepresenting his orientation and sensorium suggested "that his report may be less than reliable." (<u>Id.</u>) Plaintiff's history included never learning to read although he been in an adult literacy program. (<u>Id.</u>) He stated he could not fill out a job application or catch a bus. (<u>Id.</u>) He had had a panic disorder for twenty years and had been taking medication for it the past eleven years. (<u>Id.</u>) He had panic attacks at least every other day. (<u>Id.</u>) For the past five to six years, he had daily depression episodes. (<u>Id.</u> at 443-44.) He had no interest in activities, no energy or appetite, and insomnia. (<u>Id.</u> at 444.) He frequently contemplated suicide, but had no plans or intention. (<u>Id.</u>) He has eight adult children. (<u>Id.</u>) He denied any history of alcohol or drug abuse and drank a beer three to four times a month. (<u>Id.</u>) On examination, he had good eye contact but a bitter and surly attitude. (<u>Id.</u>) His gait was slow but otherwise unremarkable, as were his motor activity and posture. (<u>Id.</u>) His speech was spontaneous, coherent, relevant, and logical; his affect was frustrated and sad. (<u>Id.</u>) He was alert and oriented to person, place, and situation. (<u>Id.</u>) He knew which day of the week it was, but

reported not knowing the month, date, or year because he cannot read a calendar. (Id. at 444-45.) His insight was lacking; his judgment was limited. (Id. at 445.) He could not perform simple arithmetic. (Id.) Dr. Mades found this inability to be "highly suggestive of malingering because most individuals, even with cognitive deficits, tend to easily perform the simple arithmetic . . . ." (Id.) She concluded that, assuming his self-report of his functioning to be accurate, he was markedly impaired in his activities of daily living and mildly to moderately impaired in social functioning and self-care. (Id.) His concentration was poor. (Id.) She further concluded that there was credible evidence that Plaintiff suffers from panic disorder and illiteracy, but not to the extent alleged. (Id.) She diagnosed him with major depressive disorder, single episode, mild; panic disorder without agoraphobia; and a GAF of 50 based on his self-report. (Id. at 446.) She opined that his actual GAF is closer to 60. (Id.)

In February 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Aine Kresheck. (Id. at 783-94.) The period under review was September 4, 2009, to September 4, 2010. (Id. at 783.) Plaintiff was assessed as having an organic mental disorder, i.e., borderline intellectual functioning, an affective disorder, i.e., major depressive disorder, and an anxiety-related disorder, i.e., panic disorder. (Id. at 783, 784, 786, 787.) These disorders resulted in moderate restrictions in his daily living activities and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Id. at 791.) They did not cause any repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Plaintiff was assessed as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 780.) In the area of sustained concentration and persistence, he was moderately limited in four of the eight listed abilities – (I) carrying out detailed instructions, (ii) maintaining attention and concentration for extended periods, (iii) working in coordination with or proximity to others without being distracted by them, and (iv) completing a normal workday and workweek without interruptions for psychologically based symptoms – and was not significantly limited in the other four abilities. (Id. at 780-81.) In the area of social interaction, Plaintiff was moderately limited in two of the five abilities, i.e., (I) accepting instructions and responding appropriately to criticism from supervisors and (ii) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and was not significantly limited in the other three abilities. (Id. at 781.) In the area of adaptation, he was moderately limited in his ability to respond appropriately to changes in the work setting and was not significantly limited in the remaining three, including in his ability to travel in unfamiliar places or use public transportation. (Id.)

Also in February 2010, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Abigail Cooke, a single decision-maker.[7] (Id. at 795-800.) The

---

[7]See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

primary diagnosis was degenerative disc disease; the secondary diagnosis was history of right leg and ankle fracture. (Id. at 796.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day. (Id. at 796.) His ability to push or pull was otherwise unlimited. (Id.) He had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 796-98.)

## The ALJ's Decision

Noting that Plaintiff had alleged a disability onset date of June 1, 2001, the ALJ construed such as an implicit request to reopen an adverse February 2004 decision that Plaintiff's disability ended in July 2002. (Id. at 11.) The ALJ then denied that request, finding as to the DIB application that the time for reopening had ceased, the doctrine of *res judicata* applied to the pre-February 2004 period, and Plaintiff was no longer insured for DIB after March 2003. (Id.) As to Plaintiff's SSI application, it was *res judicata* as to the period before an adverse SSI decision in July 2007. (Id.) Moreover, the time for reopening the SSI decision had also lapsed, SSI benefits could not be awarded for any time prior to the application date, and the evidence before September 2009 was therefore irrelevant other than in a historical context. (Id.) Plaintiff's implicit request to reopen was denied.

The ALJ then found that Plaintiff has not engaged in substantial gainful activity since September 4, 2009 – the date of his applications. (Id. at 14.) He next determined that Plaintiff has severe impairments of degenerative disc disease, right ankle fracture residuals, panic disorder with agoraphobia, major depressive disorder, and borderline intellectual

functioning. (Id.) He did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Id.) Specifically, he did not satisfy Listing 12.05C because (a) the validity of his IQ scores was questionable and (b) the record did not establish that he had deficits in adaptive functioning before he was twenty-two. (Id.)

Addressing Plaintiff's mental impairments, the ALJ concluded that they resulted in moderate limitations in activities of daily living, moderate limitations in social functioning, and moderate to marked limitations in concentration, persistence, and pace. (Id.) They had not caused any episodes of decompensation. (Id.) When reaching this conclusion, the ALJ gave weight to the opinions of Dr. Reid with the exception of that concerning Plaintiff's limitations in concentration, persistence, and pace. (Id. at 15.)

The ALJ concluded that since September 4, 2009, Plaintiff has had the residual functional capacity (RFC) to lift twenty pounds occasionally and ten frequently; sit without limitation; stand and/or walk a total of six hours in an eight-hour day; frequently balance; and occasionally stoop, crouch, kneel, crawl, and climb stairs or ramps. (Id. at 16.) Plaintiff should not climb ropes, ladders, or scaffolds and should avoid concentrated exposure to hazardous heights. (Id.) He could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain attention and concentration for two-hour segments during an eight-hour day; respond appropriately to supervisors in a task-oriented setting where contact with coworkers and others is casual and infrequent; adapt to routine and simple work changes; and perform work at a normal pace if there are no production quotas. (Id.) When assessing Plaintiff's RFC, the ALJ considered the medical evidence,

including the opinions of Dr. Winkler – opinions that were consistent with the record – and of Dr. Kresheck. (Id. at 16-17.) The ALJ concluded that Plaintiff lacked credibility. (Id. at 17.)

Although Plaintiff has no past relevant work, with his RFC, age, and limited education, he could perform jobs as described by Dr. Magrowski. (Id. at 18.) He was not disabled within the meaning of the Act. (Id.)

### Additional Records Before the Appeals Council

After the ALJ's adverse decision, Plaintiff submitted to the Appeals Council additional records of his treatment at the Clinic, beginning when he was seen in May 2012 by Dr. Schroeder. (Id. at 982-87.) She noted she had not seen him but the one time, in December 2011. (Id. at 986.) Plaintiff had no significant complaints. (Id.) He reported he was continuing to have "a 'slight' anxiety attack at least once a day and a 'hard one' 2-3 days a week." (Id.) He would then take clonazepam, lie down, and try to relax. (Id.) His symptoms and GAF were the same as it his previous visit. (Id. at 987.) Dr. Schroeder opined that it was unfortunate that Plaintiff had not tried a SSRI because such had more potential for better, long-term control of his anxiety. (Id.) She prescribed him clonazepam and sertraline and investigated getting Plaintiff into a pharmacy assistance program so he could afford the sertraline. (Id.) She recommended that, in the future, he be prescribed only enough clonazepam to get him to the next appointment. (Id.)

In December, Plaintiff was assessed at the Clinic by Marie Gebara, M.D. (Id. at 970-81.) Plaintiff reported that things were going well and he had learned to live with his anxiety.

(Id. at 973, 974.)  His panic attacks were occurring five days a week, twice a day.  (Id. at 974.)  He was 6 feet tall and weighed 241 pounds.  (Id.)  His mental status examination was within normal limits.  (Id. at 975.)  He was alert and oriented to time, place, and person.  (Id.) He was diagnosed with panic disorder with agoraphobia, depressive disorder, not otherwise specified, and learning disability/dyslexia.  (Id. at 972.)  His GAF was 50.  (Id.)  He was continued on clonazepam and was to follow-up in two months.  (Id. at 980.)

In July 2013, Plaintiff was again assessed at the Clinic, this time by Iffat Z. Bhuiyan, M.D.  (Id. at 956-64.)  Plaintiff explained that he kept missing his appointments because of transportation problems.  (Id. at 960.)  He further explained that he had tried sertraline but had stopped taking it due to its sexual side effects.  (Id. at 961.)  Other antidepressants were of no help.  (Id.)  He was having four to five anxiety panic attacks a week, and would take clonazepam and do breathing exercises when he felt one coming on.  (Id.)  He denied any depressive symptoms.  (Id.)  He occasionally had back and right leg pain.  (Id. at 962.)  He was separated from his wife, no longer had a girlfriend, and has eight children.  (Id.)  He drank alcohol on holidays and smoked one pack of cigarettes every four days.  (Id.)  His mental status examination was normal, including being alert and oriented to time, place, and person.  (Id.)  He was continued on clonazepam and was to follow up with three months, as he preferred.  (Id. at 963.)

When seen by Dr. Bhuiyan in November, Plaintiff reported chronically-impaired sleep, but he was not interested in any interventions.  (Id. at 965-69.)  He had lost sixty pounds, but was not worried.  (Id. at 967.)  He was having unprovoked panic attacks several

times a week, but was satisfied with clonazepam and not interested in any other medications. (Id. at 969.) His prescription for clonazepam was renewed. (Id.) As before, he was to follow-up in three months. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See

20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must

have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment"

is "any impairment or combination of impairments which significantly limits [claimant's]

physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed

in the regulations and whether such impairment meets the twelve-month durational

requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix

1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to

benefits.  **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29

F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a

claimant can do despite [his] limitations."  **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir.

2009).  "'[A] claimant's RFC [is] based on all relevant evidence, including the medical

records, observations of treating physicians and others, and an individual's own description

of his limitations.'"  **Id.** (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638

F.3d 860, 865 (8th Cir. 2011).  "'Before determining a claimant's RFC, the ALJ first must

evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007)

(quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  "'The credibility of a

claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.**

(quoting Pearsall, 274 F.3d at 1218).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred by not finding that his IQ and medical conditions satisfy the criteria of Listing 12.05C (intellectual disability). The Commissioner disagrees.

To satisfy the Listing 12.05C criteria, Plaintiff must establish: "'(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.'"[8] **Hesseltine v. Colvin**, — F.3d — , 2015 WL 5023479, *3 (8th Cir. Aug. 26, 2015) (quoting Phillips v. Colvin, 721 F.3d 623, 625 (8th Cir. 2013)). See also **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006) (agreeing with the

---

[8]This element is not at issue. The ALJ found that Plaintiff had severe impairments of degenerative disc disease, right ankle fracture residuals, panic disorder with agoraphobia, and major depressive disorder.

Commissioner that each of the three elements are mandatory, including the second). "The claimant bears the burden of demonstrating that his impairment matches all the specified criteria of a listing." **McDade v. Astrue**, 720 F.3d 994, 1001 (8th Cir. 2013); accord **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010).

There were two IQ scores before the ALJ that were in the range of 60 through 70. One was the 70 when Plaintiff was fourteen. This score is outdated. See **Hesseltine**, 2015 WL 5023479, *3 n.2 (citing 20 C.F.R. § 404, Subp. P, App. 1, § 112.00(D)(1) ("IQ test results obtained between ages 7 and 16 should be considered current . . . for 2 years when the IQ is 40 or above.")). The other was the full scale IQ of 69[9] when he was forty-six. "It is undisputed that '[t]he Commissioner is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'" **Miles v. Barnhart**, 374 F.3d 694, 699 (8th Cir. 2004) (quoting Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1988)) (alterations in original). The ALJ questioned the validity of this score based on Dr. Mades' observation that Plaintiff seemed to be trying to skew the results of the WAIS-III to be consistent with a finding of dyslexia.

In **Hesseltine**, the ALJ concluded that the claimant did not satisfy Listing 12.05C criteria because her IQ scores, the least of which was a full scale IQ of 71, did not meet the first element. 2015 WL 5023479, *3. The Eighth Circuit noted that "a finding that a claimant does not meet a given listing 'does not end the inquiry.'" **Id.** (quoting Shontos v. Barnhart,

---

[9]When more than one IQ score is derived from a test, the lowest is used in conjunction with Listing 12.05. **Phillips**, 721 F.3d at 630 (citing 20 C.F.R. § 404, Subp. P, App. 1, 12.00 D.6.c.)

328 F.3d 418, 424 (8th Cir. 2003)).  "'The regulations provide that if a claimant has more than one impairment, the combined effect of the impairments will be considered.'"  **Id.** (quoting Shontos, 328 F.3d at 424).  The court then considered the following guideline in the Program Operations Manual System (POMS) for Listing 12.05C:

> D. Determining Medical Equivalence in Particular Situations
>
> 1. MEDICAL EQUIVALENCE AND MENTAL RETARDATION Listing 12.05C, Mental Retardation and Autism, applies primarily to adults with significantly subaverage intellectual functioning and deficits in adaptive behavior that were initially manifested in the individual's developmental period (before age 22).  As with other mental impairment categories, the focus of Listing 12.05 is on the individual's inability to perform and sustain critical mental activities of work.
>
> . . .
>
> c. 12.05 C
>
> Listing 12.05 C is based on a combination of an IQ score with an additional and significant mental or physical impairment.  The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, *slightly higher IQ's (e.g., 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination.* It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

**Id.** at *3-4 (quoting POMS § DI 24515.056) (emphasis in original).

As with the claimant in **Hesseltine**, Plaintiff's IQ scores, including his performance IQ, all fall within the range "that would render [him] eligible for an equivalency finding under the POMS guidelines for Listing 12.05C."  **Id.** at *4.

- 42 -

Moreover, contrary to the Commissioner's argument, there is evidence that Plaintiff "suffered deficits in adaptive functioning and those deficits initially manifest during the developmental period [before age 22].'" **Johnson v. Colvin**, 788 F.3d 870, 872 (8th Cir. 2015) (quoting Cheatum v. Astrue, 388 Fed.Appx. 574, 576 (8th Cir. 2010) (unpublished per curiam)) (alteration in original).  He attended special education classes and was not in a grade beginning with the 1997/1998 school year and for the next seven years.  He is illiterate.  See **Reed v. Colvin**, 779 F.3d 725, 727 (8th Cir. 2015) (finding that evidence claimant had attended special education classes, repeated several grades, had problems learning to read, and left school after the eleventh was relevant to question whether her intellectual disability had manifested itself before age twenty-two).  In addition to his learning difficulties, there is evidence that Plaintiff was often in trouble for aggressive behavior when in school.  See **Lott v. Colvin**, 772 F.3d 546, 550-51 (8th Cir. 2014) (finding that evidence claimant had been in special education classes, did not complete high school, and had behavioral problems was relevant to whether intellectual disability had manifested itself before age twenty-two); **Maresh**, 438 F.3d at 900 (similar holding).  The ALJ, however, did not discuss this evidence or the evidence cited by the Commissioner, e.g., raising eight children, when concluding that Plaintiff's deficits had not manifested themselves before age twenty-two.  Also, Plaintiff testified that he had received disability benefits for some period beginning at age nineteen.  Other evidence of his receipt of benefits is inconsistent.  For instance, a doctor noted that Plaintiff had been on disability for twenty years, but the period cited by the ALJ was for twelve years and did not begin until Plaintiff was in his 30s.  There is no indication in the

record of whether the award of benefits was based in any part on a deficit in adaptive functioning.

In **Hesseltine**, 2015 WL 5023479, *4, the ALJ concluded that the claimant did not satisfy Listing 12.05C criteria, but did not further discuss the Listing or whether the claimant's impairments were medically equal to the Listing. As in the instant case, the ALJ "[did] not mention the POMS guideline for determining medical equivalence, let alone explain why [the claimant] fail[ed] to meet it." **Id.** Because the court could not determine from the ALJ's summary conclusion whether there was substantial evidence to support the adverse decision, the case was to be remanded for further proceedings.

Similarly, the instant case shall be remanded for further consideration of whether Plaintiff's IQ, behavior, and severe impairments support an equivalence determination.

## Conclusion

The ALJ's determination that Plaintiff does not satisfy Listing 12.05C does not address whether his intellectual disability and other impairments are the equivalent to that Listing. This is to be addressed on remand. See **Hesseltine**, 2015 WL 5023479, *4 (remanding for further explanation of why claimant's combination of impairments were not the equivalent of Listing 12.05C when the ALJ's factual findings were insufficient to permit the court to conclude that the decision was supported by substantial evidence).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of August, 2015.